ELY *vs.* SPRAGUE and others.

A person who becomes subscriber to an associated bank under the general banking law, and pays for his stock by his bond and mortgage, stands in two capacities towards the bank, one as debtor upon his bond and mortgage, and the other as shareholder, by reason of his stock.

Where the articles of a banking association provided that dividends should be made of so much of the interest and profits as should be deemed expedient by the directors, at stated times; the directors are not, under such article, compelled to make *any* dividend if they reasonably deem it inexpedient.

A shareholder who has given a bond and mortgage for his shares or stock, with interest payable semi-annually, cannot properly refuse to pay his interest because the directors do not declare a dividend of the interest and profits, neither will the collection of such interest be restrained until the directors make a dividend.

Whether a banking assocition, under the general banking law, can lawfully incur a debt for the purchase of state stocks,—*quere*, but at any rate, the president of such association, who signed the contract for the payment of such debts, cannot, in a collaterial suit with the association, qestion the validity of such debt.

*M. F. Delano,* for complainant.

*S. Mathews,* for defendants.

THE VICE CHANCELLOR. The nature and history of this suit and the points presented by it may appear from the bill and affidavits, and the printed articles of association connected with the affidavits. The following brief outline will perhaps sufficiently suggest the points. In the latter part of the year 1838, several persons residing in the city of Rochester were desirous of entering into an association for the purposes of banking, under the law commonly called the general banking law, passsed April 18,

1838. They entered into such articles, bearing date Aug. 30, 1838. The complainant was a subscriber. Article 6 of the articles of association was as follows: "The board of directors are authorised to invest the whole of the capital stock, and the whole of any increase from time to time, permanently, on bonds drawing interest at the rate of seven per cent. per annum, payable semiannually, secured by mortgages on unincumbered real estate within the state of New-York, worth at least double the amount of such bond and mortgage, or in the public debt of the United States or of any state in the Union, or of any incorporated city of the state of New-York." Another of the provisions was contained in sec. 13 of article 4, and is as follows: "Dividends of so much of the interest and profits of the association as shall be deemed expedient by the directors, shall be declared and paid half yearly, during the months of July and January in each year." Under these articles there were subscriptions, which were paid in and secured by bond and mortgage, to the amount of $295,606 99. There were farther cash subscriptions sufficient to make the whole capital $332,000. Of this, however, there was only paid in actual cash the sum of $29,219 43—the balance of the cash subscriptions being secured by notes and stocks, and not yet paid, amounting to $7,173 58. Of these subscriptions the complainant made subscriptions to the amount of $30,000, and secured the same by his mortgages under the terms of the articles. He made farther subscriptions to the amount of $3,000, to be paid in cash, of which he paid $1,000, and secured the balance by his notes and pledge of his stock.

The complainant was elected the first president of

the association.    Here was then a banking associa-Nov. 1840.
tion with nearly $300,000 in bonds and mortgages,
and a cash capital of less than $30,000.    These
were feeble means to do a banking business upon.
Under the general banking law, before they could
procure circulating notes from the Comptroller, they
must deposit with him an equal amount of state
stocks and bonds and mortgages.    They had no
means to procure the state stocks, except these
bonds and mortgages, their cash, and their credit.
These bonds and mortgages were not convertible
for this purpose ; they would want all their cash,
and more, to redeem the notes they might put into
circulation.    They must necessarily resort to their
credit to purchase state stocks, and they determined
so to do ; and while the complainant was president
of the association, they did purchase $70,000 of the
public debt of two different states upon credit, which
were hypothecated with the Comptroller, together
with an equal amount of bonds and mortgages, for
which they obtained circulating notes to such an
amount as the Comptroller thought prudent to give
them.    Under these arrangements the association
commenced banking operations in the spring of 1839,
with the complainant for their president.    It was
evidently the idea and expectation both of the com-
plainant and the other associates, that the bonds and
mortgages given to the association to secure the
capital stock, could be used to purchase state stocks
and raise funds, or to pay the debts which might be
incurred for such purchases or for the funds so
raised.

In this expectation they seem to have been disap-
pointed, but they continued their banking business

Ely
v.
Sprague and
others.

45

Nov. 1840.

Ely
v.
Sprague and others.

and still continue it, and have made very respectable profits. No dividends, however, have been declared for the month of January or the month of July, 1840, and the association have called upon the mortgagors, including those who have executed mortgages in payment of their stock, for the payment of their interest semiannually, as it accrued upon their mortgages. The complainant has transferred a part of his stock which he received for his mortgages, upon the books of the association, but as he alleges merely as collateral security for certain debts owing by him. Something more than one hundred shares now stand in the name of the complainant upon the books of the association. The complainant is called upon to pay the interest due on his mortgage on the 1st of August last, and he has filed this bill to restrain the association from collecting the same, until they have declared a dividend. An order was made for the defendants to show cause why an injunction should not be issued pursuant to the prayer of the bill, and cause was shown upon a special motion day by affidavit.

The complainant insists that under the 13th section of the 4th article of the articles of association, the association are bound to declare a dividend, be it ever so small, as provided by that section, before they can collect the interest upon the mortgages given by the stockholders. A copy of that section has before been given.

By the 1st section of the 3d article of the association, it is provided, that " all the power, rights and privileges of each and all the associates, and those who may become such, by virtue of these articles, are hereby irrevocably delegated to, and vested in,

and shall be exercised only by a board of directors, and such officers and agents as they shall appoint."

This seems to vest very full and ample, and indeed it may be said the whole powers of the association in the board of directors. The power of this board may be limited and directed by subsequent articles of the association, and the complainant insists that it is so limited and directed by the 13th section of the 4th article above mentioned. A careful examination of the wording of this 13th section, satisfies me that the subject of dividends is also within the direction, and was left to the discretion of the directors by that section. "Dividends of so much of the profits and interest of the association as shall be deemed expedient by the directors, shall be declared," &c. is the language of the section. This seems to me only to fix the times at which the dividends shall be payable, and not to positively direct that they shall make *some* dividends of the profits, if any shall be earned. If the idea of the complainant is true, the section could be satisfied formally, by making the most trifling dividend.

It is clear to me that this was not intended, but that it was intended to leave the whole matter to the opinion of the directors, as to the expediency of making any dividend and of the amount. If the directors improperly and corruptly refused to make a dividend, that might present another question. But nothing of that kind is pretended here. On the contrary, they show that though they have made profits, there are outstanding debts of the association for stocks purchased, which were falling due from time to time, and for which as prudent men they should provide. They had utterly failed in convert-

ing their mortgages into cash, and they had no means except the profits, and interest on the mortgages to meet these debts. These whole circumstances were laid before the board of directors, and they unanimously, with the exception of the complainant, determined not to make a dividend. From their statement I have no doubt they did wisely, and acted like prudent bankers, desirous of preserving the character and credit of their association. They had hoped at first to do a banking business without money, but finding this impossible, as every such association will so find it, they determined to preserve the actual means they had under their control, to fulfil in good faith their contracts already made. In this they acted honestly, prudently and creditably to themselves.

The complainant further insists that this association had no legal right to incur such debt for the purchase of state stocks. Perhaps this objection can hardly come with a very good grace from the very person who, as president of the association, executed the contracts or obligations on behalf of the association, for the payment of such debts. As the question is here presented, it is not necessary to decide the powers of the association to incur such debts. The complainant's bill hardly opens a fair inquiry into this matter, unless he would ask the association to repudiate the debt, and divide the proceeds of the profits realized from it among the associates. This would be a most ungracious application to the power of this court.

The object of the complainant's bill is not so much to compel a specific execution of the articles of association, by compelling the directors to declare a dividend, as it is to restrain the collection of the

mortgage against himself until such dividends are

made. These mortgages or this mortgage was the price paid for the stock. The complainant subscribed for stock in the association, and paid for it by mortgages payable at such times as was mutually agreed upon between the parties. This was merely a mode of payment. There is no necessary connexion afterwards, between the stock and the mortgages. When the complainant received his scrip for the stock, it was his own property. He might transfer it as he pleased, and indeed he has transferred a considerable portion of it, and yet the debt due upon his mortgage remains a matter of personal obligation between him and the association. He is bound to pay it according to its terms. This is an independent contract which he should fulfil. He stands in two capacities, one as debtor to the association, one as stockholder in it. These capacities are independent of each other. As a debtor, he must pay his debt. As a stockholder he may have a right, in certain cases that may be supposed, to come into this court to compel a specific performance of the articles of agreement. There is no necessary connexion between the debt and the stock, and he cannot restrain the payment of the one, by reason that he has been paid no dividends upon the other, under the case here presented.

The motion for injunction must therefore be denied, with costs to be taxed.